```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA
                      Civil No. 08-762(DSD/SRN)
```

Dingxi Longhai Dairy, Ltd.,
a China Company incorporated
in the Province of Gansu, China,

       Plaintiff,

v.                                             **ORDER**

Becwood Technology Group, L.L.C.,
a U.S. Company incorporated in
The State of Minnesota, USA,

       Defendant.

    Delin Qu, Esq., Qu Law Offices, 821 Raymond Avenue, Suite 240, St. Paul, MN 55114 and Anthony J. Pruzinsky, Esq. and Hill, Rivkins & Haden, 45 Broadway, Suite 1500, New York, NY 10006, counsel for plaintiff.

    Jason A. Lien, Esq., James F. Killian, Esq., Paul B. Civello, Esq., Sarah A. Horstmann, Esq. and Maslon, Edelman, Borman & Brand, 90 South Seventh Street, Suite 3300, Minneapolis, MN 55402, counsel for defendant.

This matter is before the court upon the motion of plaintiff Dingxi Longhai Dairy, Ltd. ("Dingxi")[1] for summary judgment. Based on a review of the file, record and proceedings herein, and for the following reasons, the court grants Dingxi's motion.

---

[1] Dingxi is a Chinese company incorporated in Gansu Province, China, with its principal place of business in Dingxi City, China. (Compl. ¶ 1.)

BACKGROUND

This dispute arises out of a February 28, 2007, contract between Dingxi, a Chinese manufacturer, and defendant Becwood Technology Group L.L.C.[2] ("Becwood"), a Minnesota distributor. Pursuant to the contract, Dingxi agreed to sell Becwood six hundred and twelve metric tons of organic inulin, a dietary fiber extract used in processed foods. (Civello Decl. Ex. 1 at 1.) Upon receipt, Becwood planned to resell the inulin to non-party Stonyfield Farm, Inc., ("Stonyfield") for use in its yogurt products.

The contract provided for delivery of the inulin to Londonderry, New Hampshire, but also listed Tianjin-Xingang port under "Terms of Delivery." (Id.) It also included packaging and labeling instructions. (Id. Ex. 1 at 2, 5.) In addition, Becwood reserved the right to reject any shipment that did not meet specifications after testing by Minnesota-based Medallion Laboratories ("Medallion"). (Id. Ex. 1 at 2.) Lastly, the contract stated that "[a]ny claims resulting from delayed shipment and/or inferior quality and/or other deviations from contract terms shall be borne by vendor." (Id. Ex. 1 at 1.)

In March 2007, Dingxi began packaging the inulin at its facility in Gansu Province, China, for a series of shipments to the United States. On March 5 and 6, 2007, Dingxi loaded the packaged

---

[2] Becwood is a Minnesota company with its principal place of business in Minnesota. (Compl. ¶ 1.)

2

inulin onto trucks for overland transport to the port of Tianjin. (Id. Exs. 2-3.) While David Goulet ("Goulet"), Becwood's president, had instructed Dingxi to transport the packaged inulin in enclosed trucks, Dingxi used covered, paneled and flatbed trucks to drive the inulin forty hours from Gansu Province to Tianjin. (Id. Ex. 4 at 55; Pruzinsky Decl.[3] Exs. 5 at 54-55, 9 at 29-31, 58-59.)

In total, the inulin traveled overseas in four separate shipments. (Civello Decl. Ex. 7.) Only the first two shipments - a total of twelve containers - are relevant to this order. (Id.; see Order [Doc. No. 21].) Of the twelve containers, eleven passed through the Panama Canal to the east coast of the United States and one was discharged at Los Angeles and carried overland to the east coast. (Pruzinsky Decl. Ex. 15.)

Dingxi sent Becwood invoices for both shipments on March 20, 2007. (Id. Ex. 8.) The invoices were dated March 10, 2007, and stated "FOB Xingang [Tianjin]." (Id.) Becwood paid Dingxi for the first shipment in mid-April 2007. (Id. Ex. 16.) The shipments arrived shortly thereafter. Upon inspection, Stonyfield determined that the shipments were non-conforming due to "condensation issues." (See id. Ex. 33 at 28; Civello Decl. Ex. 8.) Goulet immediately flew to the east coast to inspect the shipments.

---

[3] All references to the Pruzinsky declaration refer to docket number 115.

3

(Civello Decl. Ex. 10.) Goulet then informed Dingxi that mold was present on the exterior of the inulin packaging. (Id. Ex. 12.) Becwood rejected both shipments and refused to pay for the second shipment. (Id.)

Dingxi commenced this action on March 18, 2008, alleging fraud and breach of contract with respect to the second, third and fourth shipments. On July 1, 2008, the court dismissed Dingxi's fraud claim in its entirety and its breach of contract claim with respect to the third and fourth shipments. (Order [Doc. No. 21].) On July 11, 2008, Becwood asserted counterclaims related to the first two shipments for breach of contract, tortious interference with contractual and/or prospective economic relations and breach of express and implied warranty.[4] On February 10, 2010, Dingxi brought the instant motion for summary judgment on its remaining breach of contract claim and Becwood's counterclaims.

**DISCUSSION**

**I.   Summary Judgment Standard**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, deposition, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

---

[4] Becwood amended its answer on October 28, 2008, to assert the breach of express and implied warranty counterclaim.

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party. See id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. Moreover, if a plaintiff cannot support each essential element of his claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Id. at 322-23.

**II. Breach of Contract**

The court first considers Dingxi's breach of contract claim and Becwood's breach of contract counterclaim. Both parties agree that the contract is governed by the United Nations Convention on Contracts for the International Sale of Goods ("CISG"). Under the CISG, a claimant must plead the traditional four elements of a breach of contract claim: formation, performance, breach and

5

damages.  See Magellan Int'l Corp. v. Salzgitter Handel GmbH, 76 F. Supp. 2d 919, 924 (N.D. Ill. 1999).

As an initial matter, the court notes that the parties' breach of contract claims involve different theories about when the risk of loss transferred from Dingxi to Becwood.  Dingxi alleges that the parties agreed to a free-on-board ("FOB") contract which provided for the risk of loss to transfer from Dingxi to Becwood at the port of Tianjin.  See Jan Ramberg, ICC Guide to Incoterms 2000 173 (ICC Publishing S.A. 1999) (in FOB contract, risk of loss transfers from seller to buyer once goods pass ship's rail at port of shipment).  According to Dingxi, its only duty under the contract was to deliver the inulin safely to Tianjin.  Dingxi claims that it fully performed this duty and that Becwood breached the contract by failing to pay for the second shipment, damaging Dingxi in the amount of $208,084.  In contrast, Becwood argues that the parties did not enter into a FOB contract.  According to Becwood, Dingxi bore the risk of loss throughout the overseas shipment and was responsible for safely delivering the inulin to Londonderry, New Hampshire.  Becwood claims that Dingxi breached the contract by delivering damaged goods, causing Becwood to lose expected profits.

A ruling on whether the parties agreed to FOB terms, however, is unnecessary in this case because summary judgment is warranted on both breach of contract claims regardless of whether the risk of

loss transferred from Dingxi to Becwood at Tianjin or Londonderry. As discussed below, no genuine issue of material fact exists as to whether Dingxi breached or failed to perform under the contract.

According to Becwood, Dingxi damaged the inulin by transporting it in unenclosed trucks from Gansu Province to Tianjin. (Pruzinsky Decl. Exs. 5 at 54-55, 9 at 29-31, 58-59; Civello Decl. Ex. 4 at 55.) Becwood claims that this method of transportation exposed the inulin to moisture and was contrary to Goulet's instructions and acceptable practices in the inulin industry. (Pruzinsky Decl. Ex. 5 at 54-55; Civello Decl. Ex. 18 at 3.) Becwood alleges that the inulin was again exposed to moisture at Tianjin, where shipping personnel repackaged some of the inulin due to Dingxi's improper packaging techniques. (Civello Decl. Ex. 4 at 69-71.)

To support its position that the inulin was damaged, Becwood submits photographs of the alleged mold and the eyewitness testimony of Goulet. (Id. Ex. 11; Goulet Decl. ¶ 2.) In addition, Becwood offers a report prepared by the surveyor its insurer retained to inspect the inulin shipments at Londonderry. In the report, the surveyor reached the "preliminary conclusion ... that the twelve (12) containers received ... were potentially wet with apparent signs of molding on the packaging." (Civello Decl. Ex. 20

at 262.) The report also stated that "[w]hether the product was contaminated will be determined by further product testing by [Medallion]." (Id.)

Becwood's evidence is insufficient to create a genuine issue of material fact with respect to whether the inulin was damaged. While Becwood states that it believed that the inulin shipments were damaged, the evidence before the court indicates that its belief was unfounded. For instance, Medallion's final report concluded that the tested inulin was fit for human consumption. (Pruzinsky Decl. Ex. 12 at Req. No. 36.) Furthermore, after Becwood rejected the shipments, it repurchased them at salvage. (Id. Exs. 12 at Req. No. 30, 34.) Becwood then repackaged the inulin and sold it to other customers as "fit for human consumption" without labeling the inulin as "reconditioned" or informing the customers that it had previously rejected the product. (Id. Ex. 12 at Req. Nos. 30, 34-35, 39.) Lastly, Becwood submits no evidence establishing that the substance it allegedly found on the exterior of the inulin packaging was mold or any other contaminant. These facts indicate that, despite Becwood's initial belief, the inulin was not damaged at Londonderry.

Moreover, other evidence negates Becwood's assertion that the inulin was damaged at Tianjin. The ocean carrier that transported the inulin issued clean bills of lading for both shipments. See Nat'l Transp., Inc. v. Inn Foods, Inc., 827 F.2d 351, 354 (8th Cir.

1997) (clean bill of lading is evidence of delivery in good condition as to goods carrier can visually observe or inspect); (Pruzinsky Decl. Ex. 13.) Additionally, shipping personnel at Tianjin received the inulin and loaded it into containers without exception. (Pruzinsky Decl. Exs. 9 at 34, 11 at 103-04.) If the inulin had been damaged at that time, shipping personnel would have notified Dingxi. (Id. Exs. 9 at 104-05, 11 at 109-11.)

In the face of this evidence, a reasonable jury could only render a verdict in favor of Dingxi, and therefore there is no genuine dispute. Rather, summary judgment is warranted in favor of Dingxi on Becwood's breach of contract counterclaim because Becwood cannot prove that Dingxi breached the contract. Conversely, summary judgment is also warranted on Dingxi's breach of contract claim because no genuine issue of material fact exists as to whether Dingxi performed under the contract, and it is undisputed that Becwood did not pay for the second shipment. Accordingly, the court grants Dingxi's summary judgment motion with respect to these claims.

**III. Tortious Interference with Contractual Relations**

Becwood next alleges that Dingxi tortiously interfered with its existing and prospective contractual relations with Stonyfield by delivering damaged inulin and refusing to cure its breach. To establish both claims, Becwood must show intentional and improper interference by Dingxi. See Flora v. Firepond, Inc., 260 F. Supp.

9

2d 780, 789 (D. Minn. 2003) (citation omitted) (elements of tortious interference with existing contractual relations); <u>United Wild Rice, Inc. v. Nelson</u>, 313 N.W.2d 628, 633 (Minn. 1981) (citing Restatement (Second) of Torts § 766B (1979)) (elements of tortious interference with prospective contractual relations). <u>See also</u> <u>Viva Vino Imp. Corp. v. Farnese Vini S.R.L.</u>, No. 99-6384, 2000 WL 1224903, at *1 (E.D. Pa. Aug. 29, 2000) (CISG does not apply to tort claims).

Becwood, however, can neither establish Dingxi's intent to interfere nor actual interference by Dingxi. No evidence before the court suggests that Dingxi sought to procure the breach of Becwood's existing or prospective contractual relations with Stonyfield. Additionally, as discussed above, the evidence before the court indicates that Dingxi did not deliver damaged inulin to Becwood. Consequently, Becwood's argument that Dingxi improperly interfered with its relationship with Stonyfield by delivering damaged inulin fails.

In the alternative, Becwood argues that Dingxi improperly interfered by refusing to cure its breach. Specifically, Becwood asserts that after it rejected the first two shipments, Dingxi refused to allow it to inspect the third and fourth shipments before Becwood accepted delivery and made payment. Instead, Becwood alleges that Dingxi unilaterally recalled the third and fourth shipments before they reached the United States, impairing

Becwood's ability to supply inulin to Stonyfield.

However, even if the court assumes that Dingxi's recall of the third and fourth shipments constituted improper interference, summary judgment is still warranted. As previously noted, Becwood presents no evidence indicating that Dingxi acted with the intent to procure the breach of Becwood's existing or prospective contractual relations with Stonyfield. For these reasons, the court grants Dingxi's motion with respect to Becwood's tortious interference with contractual relations counterclaims.

**IV. Breach of Express and Implied Warranty**

Lastly, Becwood alleges that Dingxi breached express and implied warranties by delivering damaged inulin. To establish a breach of warranty claim, Becwood must prove "(1) the existence of a warranty; (2) breach of the warranty; and (3) causation of damages." Duxbury v. Spex Feeds, Inc., 681 N.W.2d 380, 393 (Minn. Ct. App. 2004) (elements for breach of warranty claim under Uniform Commercial Code); see Chi. Prime Packers, Inc. v. Northam Food Trading Co., 408 F.3d 894, 898 (7th Cir. 2005) (caselaw interpreting analogous provisions of Article 2 of Uniform Commercial Code may inform court when applying CISG).

To establish the first element, Becwood alleges that Dingxi expressly warranted that the inulin would be "of a certain quality and standard for use in the production of food." (Am. Answer ¶ 93.) In addition, Becwood asserts that an implied warranty of

11

merchantability governed the contract pursuant to Article 35 of the CISG. Article 35 provides that "[t]he seller must deliver goods which are of the quantity, quality and description required by the contract and which are contained or packaged in the manner required by the contract." United Nations Convention on Contracts for the International Sale of Goods, art. 35(1), Apr. 11, 1980, S. Treaty Doc. No. 98-9 (1983), 1489 U.N.T.S. 3.

Even assuming these warranties apply, however, summary judgment is appropriate because Becwood cannot establish breach or causation. No evidence before the court indicates that Dingxi's actions or omissions damaged the inulin or otherwise caused it not to comply with the express or implied warranties. To the contrary, the evidence before the court indicates that the inulin Dingxi delivered to Becwood was not damaged and, therefore, no breach of warranty occurred. Indeed, the evidence indicates that the inulin was fit for human consumption, as demonstrated by the fact that Becwood later repurchased and sold it to customers for this purpose. Therefore, the court grants Dingxi's motion with respect to Becwood's breach of express and implied warranty counterclaim.

**CONCLUSION**

Accordingly, based on the above **IT IS HEREBY ORDERED** that Dingxi's motion for summary judgment [Doc. No. 110] is granted. **LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  June 17, 2010

s/David S. Doty
David S. Doty, Judge
United States District Court
